## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| FREDERICK PALMER,<br><br>      Plaintiff,<br><br>v.<br><br>INTERNATIONAL BUSINESS MACHINES CORPORATION,<br><br>      Defendant. | **Civil Action No.:** 1:26-cv-4<br><br>**COMPLAINT**<br>(Jury Trial Demanded) |

## INTRODUCTION

1. Fred Palmer is a 61-year-old technical sales specialist with decades of experience in the technology industry, including multiple periods of employment with Defendant International Business Machines Corporation ("IBM").

2. IBM is a multinational technology corporation that employs thousands of sales professionals across the United States. Most recently, Palmer worked as a Brand Technical Specialist with IBM's Power Systems sales team, starting in April 2022. He worked remotely from his home in Gibsonville, North Carolina but reported to IBM's office in Durham.

3. Palmer was a consistently successful performer for IBM. In 2023, he achieved 97.67% of his fiscal year sales target, closing $7.83 million in sales against a $7.86 million quota target, and received "Successful" manager ratings in both Business Outcomes and Skills on his performance reviews.

4. His global manager at that time referred to Palmer as a "knowledgeable Power Systems Expert" and noted she receives "unsolicited compliments from sales management and his sellers."

5. IBM recognized Palmer's contributions through an equity award in August 2024 for outstanding performance.

6. In March 2025, Palmer's daughter suddenly and unexpectedly passed away.

7. Palmer immediately communicated with his manager about the situation and coordinated a plan for taking bereavement leave.

8. IBM management approved Palmer's leave and encouraged him to take the time he needed.

9. Palmer took two weeks to grieve. He then returned to work and was traveling for meetings shortly thereafter.

10. Mere weeks after Palmer returned from bereavement leave, despite his strong track record, IBM placed Palmer on a Performance Improvement Plan ("PIP") with objectively unattainable requirements on May 9, 2025.

11. To be clear, Palmer's PIP goals were impossible, and more stringent than younger IBM employees in similar roles. IBM designed the PIP that way to terminate Palmer because of his age.

12. Palmer was given until June 30, 2025, less than two months, to satisfy his PIP requirements.

13. No employee could fulfill these requirements given the timing of the sales cycle and IBM's major product announcement scheduled for July 8, 2025—which caused clients to delay purchasing decisions.

14. IBM's discriminatory treatment of Palmer had nothing to do with his performance. Younger employees with worse performance records, including a low-performing white male in his early 30s, were given exceptions from PIPs. Meanwhile, Palmer's sales teammate—a black woman with the exact same territory, quota, and performance—was not placed on a PIP.

15. IBM intended to replace Palmer with a younger employee because it only approved hiring tickets for lower-banded employees to fill the open slot.[1]

16. Age, not performance, was the motivating factors behind IBM's implementation of Palmer's PIP, and his ultimate termination on July 23, 2025.

## **PARTIES**

17. Fred Palmer is a United States citizen residing at 717 Ashley Woods Dr, Gibsonville, North Carolina 27249, in Guilford County, North Carolina.

18. IBM was incorporated, and is existing, under the laws of the State of New York. IBM's principal place of business is located in Westchester County, New York.

19. IBM regularly conducts and transacts business throughout the United States, including in the State of North Carolina, where Palmer is employed at IBM's

---

[1] IBM operates an internal ranking system for employees that places them into bands. A lower band correlates to less experience and achievements.

3

facility located at 4205 S Miami Blvd, Durham, North Carolina 27703.

## JURISDICTION & VENUE

20. Subject matter jurisdiction over this matter is conferred upon and vested in this Court under 28 U.S.C. §§ 1331 and 1332.

21. Supplemental jurisdiction over Palmer's state law claim exists under 28 U.S.C. § 1367(a).

22. This Court has personal jurisdiction over IBM because IBM regularly conducts and transacts business within this District, including operating the facility in Durham, North Carolina, where Palmer reported during his employment.

23. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District, where Palmer works and where the discriminatory employment actions took place.

24. This action has been brought within all applicable statutes of limitations and/or repose.

## FACTUAL ALLEGATIONS

### Palmer's Background and Employment History

25. Palmer is a 61-year-old technology sales professional with extensive experience in the industry.

26. He holds a bachelor's degree in accounting and began his career with IBM as a machine operator in a manufacturing plant in 1983.

27. Palmer soon completed prerequisite training and was promoted to the role of Systems Engineer, a position he held from 1986 to 1992.

28. After working elsewhere in the technology industry, all as a systems engineer/analyst, Palmer rejoined IBM in April 2022 as a Brand Technical Specialist in the Power Systems sales division.

29. IBM acknowledged Palmer's history and tenure with the company by listing his service date as October 5, 2013.

30. Palmer was eligible for retirement on April 9, 2026.

### Palmer's Strong Performance Record

31. Since rejoining IBM in 2022, Palmer consistently demonstrated his strong performance.

32. In most sales jobs, including at IBM, performance is primarily measured against a quota. Each employee has a target revenue amount he or she is responsible for within a sales period.

33. During his first performance review period (the first half of 2022, or "1H-2022"), Palmer was in an onboarding phase and completed 164 hours of education and began to learn his customers and territory.

34. Lee, his global manager at the time, approvingly commented that "[h]e was well positioned to take on a territory in 2H[,]" and added:

> Fred has a very positive attitude and is extremely responsive. He is very proactive and energized in his role. He is typically the first to reply when asked for updates, joining cadence and team calls. He is focused on teaming with his seller to drive strong outcomes in their territory. I look forward to working with Fred and seeing him succeed.

5

35. Palmer executed on his potential in the second half of 2022. He delivered 82% of his overall business results, earning $2.959 million against a $3.917 million primary quota element for 76% attainment, and $1.780 million against a $1.835 million secondary quota element for 97% attainment.

36. Palmer's performance continued to improve in 2023. In the first half of 2023, Palmer received "Successful" manager ratings in both Business Outcomes and Skills, achieving $2.6 million against a $3.251 million target with 48.544% plan attainment.

37. Lee recognized Palmer as a "good contributor" to the team and commented on several of his "wins that were integral to driving revenue in his two HUB territories."

38. For example, Palmer was one of the first National Power technical sellers to successfully sell a Power Virtual Server ("PowerVS")[2] deal in the first half of 2023, demonstrating his technical expertise and sales acumen.

39. Palmer's exceptional performance peaked in the second half of 2023. He achieved 97.67% of his fiscal year target, earning $7.83 million against a $7.86 million target with 83.84% ISI Plan commission.

40. For his outstanding work, Palmer received "Successful" manager ratings in both Business Outcomes and Skills on his performance reviews.

41. IBM formally recognized Palmer's strong performance by giving him an

---

[2] PowerVS was IBM's cloud-based infrastructure solution that rose in demand starting in 2023.

6

equity award in August 2024, consisting of approximately 145 shares.

42. On August 5, 2024, Laura T. Smith, Vice President of Technical Sales for IBM Technology, National Market, personally congratulated Palmer on his equity award, acknowledging his exceptional contributions to the company.

43. Throughout his tenure, Palmer consistently received unsolicited compliments from sales management and sellers, was recognized as a knowledgeable Power Systems expert, and completed extensive training hours—earning multiple certifications.

44. Palmer consistently spent time working in his territory, working directly with clients, and going above and beyond his job requirements.

45. For example, an IBM client was experiencing performance issues with a "scale-out server" (small to medium in size). Leveraging his more than thirty years of systems engineering experience, Palmer helped the client optimize the server, resulting in significantly improved efficiency.

46. This hands-on work was outside the scope of his typical responsibilities, but the extra effort established Palmer as a knowledgeable and trustworthy resource for the client—exactly what a great salesperson would do.

47. That time and effort Palmer invested in the client relationship reaped benefits for IBM; he successfully sold that same client a new IBM server the same year.

48. In December 2023 alone, Palmer booked $1.56 million in sales revenue.

## Changes in Territory and Performance Challenges in 2024

49. Palmer's 2024 performance was significantly impacted by factors beyond his control, including territory moves and plan changes implemented by IBM.

50. Prior to 2024, Palmer's sales organization was divided into two groups.

51. The first, known as "the Squad," consisted of sales and technical personnel aligned by industry to cover a select group of large IBM customers.

52. The second, Palmer's team, was called "BPS" (Business Partner Specialists).

53. BPS handled the remaining small to medium sized customers in the territory beyond the select group covered by the Squad.

54. A sales representative and corresponding technical specialist in the Squad typically managed 10-20 accounts. BPS sales representatives and his or her technical specialist could be responsible for 3,000-5,000 accounts.

55. In 2024, IBM made changes to the territories and overall structure of the Power Systems sales team.

56. IBM reorganized the BPS group by splitting it into two sections: (1) 90% of the accounts were moved to a newly created group called "Digital," staffed largely by recent college graduates whose primary role was outbound telemarketing, and (2) the remaining BPS territory continued to be handled by the existing BPS sales representative and technical specialist—Mamie Ryant and Palmer, for example, covered these clients in a territory that consisted of Maryland, Virginia, Delaware, West Virginia, and Washington D.C.

57. Through 2024, Lee was the manager overseeing technical specialists for the Squad, the BPS territory, and the Digital territory.

58. In 2025, Lee became the technical manager for only the Squad, and Kennedy, Palmer's former peer, was assigned as technical manager for both the BPS and Digital groups.

59. This restructuring, along with the territory changes that came with it, created substantial difficulties for Palmer and other technical specialists in his position.

60. It slashed Palmer and Ryant's accounts from approximately 4,000 to 400.

61. Further, despite this reduction, Palmer's sales quota only dropped from approximately $5 million in 2023 to $4 million in 2024.

62. The newly formed Digital team, with lower-cost staff and a much larger account base, inherited just $1 million of Palmer's former quota and performed very well.

63. Their high account volume and relatively low quota set them up for success.

64. The BPS group, however, was left with a reduced customer base and an aggressive quota, which made success extremely difficult, if not impossible.

65. To illustrate, in March 2024, Palmer's sales plan included four weighted elements: (1) total annual sales, (2) first-half sales, (3) PowerVS sales, and (4) new account sales.

9

66. A significant portion of the quota was tied to new accounts, but Palmer's assigned territory of 400 accounts offered limited potential in this area. Any brand-new accounts Palmer might discover would be assigned to the Digital group, not BPS, meaning he could not apply those sales toward his quota.

67. Palmer reviewed the list of eligible new accounts in his territory and determined that none were likely to purchase IBM servers in 2024. This meant that roughly 30% of his quota was unattainable from the start.

68. To make matters worse, in April 2024, IBM removed the PowerVS element from the plan—the one area where Palmer was performing well and had built his sales strategy.

69. This change caused a significant setback in both commissions and quota progress, taking him months to recover.

70. IBM management acknowledged these issues as company mistakes that were beyond the control of affected employees.

71. In the summer of 2024, Palmer attended a meeting with Michael Watt, manager of the BPS sales representatives, and Palmer's BPS sales representative partner, Mamie Ryant.

72. Watt assured Ryant and Palmer that no employment action—such as being placed on a PIP—would occur based on 2024 sales performance.

73. Moreover, Watt relayed that leadership recognized multiple mistakes had been made with quotas and territory assignments and stated these issues would be corrected in the following year.

74. Despite these challenges, Palmer's 2024 performance review showed "Successful" ratings for Skills, and he was the first technical seller to close a PowerVS opportunity that year.

75. Palmer was a dedicated, reliable employee throughout his time at IBM. He constantly worked his territory, assisted others on the team, and pushed to better himself for the company through trainings and certifications.

76. Palmer's management told him not to worry about poor performance and that no one would go on a PIP because the territory moves were IBM's mistake.

### Palmer's Bereavement Leave

77. On March 17, 2025, Palmer's daughter, Emma, passed away suddenly and unexpectedly.

78. Palmer immediately notified his manager, Kennedy, who told him to take as much time off as needed.

79. Palmer took the next two weeks off as bereavement leave.

80. Palmer was entitled to four weeks of paid bereavement leave.

81. On March 31, 2025, after two weeks away, Palmer began working again from his home office, responding to emails and making phone calls.

82. On April 10, 2025, Palmer traveled to a customer location in South Florida.

83. On April 22, 2025, Palmer traveled to Atlanta, Georgia to attend a second quarter sales planning meeting with his peers.

84. Kennedy approved of Palmer's return to work as described above.

85. IBM put Palmer on a PIP just over three weeks later.

### IBM's Discriminatory Treatment of Palmer

86. Despite Palmer's strong track record and the challenges created by IBM's own territory changes, on May 9, 2025, IBM placed Palmer on a PIP.

87. This action directly contradicted IBM management's previous statements to Palmer that he need not worry about a PIP.

88. The PIP had a June 30, 2025, deadline to satisfy the requirements.

89. The PIP goals included: achieving or exceeding 45% of 2025 total Target Incentive ("TI") through June 30, 2025; completing required learning; completing two technical activities per week (48 total in 1H); creating at least two new Opportunity Items in IBM Sales Cloud;[3] and demonstrating value propositions for top three opportunities.

90. The PIP quota was objectively unachievable given the sales cycle timing and market conditions.

91. IBM scheduled a major product announcement for July 8, 2025, for Palmer's products, which caused clients to delay purchasing decisions until after the announcement—making it virtually impossible for Palmer to achieve the required sales number by June 30, 2025.

92. IBM's discriminatory treatment of Palmer is underscored by its conduct

---

[3] When Palmer, or any technical sales representative, would identify a client with a potential opportunity for a power server, he would enter it into IBM's sales tracking system (IBM Sales Cloud) as an opportunity item ("OI"), and then hand it off to his sales representative who would work to progress the deal.

12

with other employees working in the same market.

93. As a technical sales specialist, Palmer was teamed with a sales representative who has the exact same territory, quota, and performance as him. However, that sales representative, Ryant—a black woman—was not placed on a PIP.

94. This fact is especially indicative of IBM's discrimination because Ryant, as the sales representative, is the primary point of contact for clients and is ultimately responsible for achieving sales objectives.

95. Palmer's role as a technical sales specialist is to provide expertise and help move deals forward, but not to close them.

96. It is entirely illogical that Palmer was fired based on a sales quota that he was not directly responsible for, while the employee that was responsible was not placed on a PIP or otherwise held accountable.

97. In fact, no BPS sales representatives were placed on PIPs for performance in 2024—only technical sales specialists were.

98. In general, the younger employees on Lee's team were spared from PIPs. IBM systematically targeted older employees while exempting younger ones in the Power Systems market—even though the entire team struggled in 2024 thanks to IBM's self-inflicted harm.

99. Plaintiff understands that Mark Roper for example, a younger white male in his 30s who works as a technical engineer on Lee's team, had particularly low performance but was given an exception from being placed on a PIP.

100. IBM justified this disparate treatment, according to Palmer's knowledge and belief, by relying on the success Roper had two years ago, similar to the success Palmer experienced in 2023.

101. Glenda Morales, a Hispanic woman in her 30s, was placed on a PIP but with attainable goals.

102. IBM's treatment of Palmer is not a singular occurrence. Rather, Palmer is an example of IBM's systematic pattern of age discrimination against employees over 40.

103. The Human Resources Department's directive to place Palmer on a PIP exemplifies IBM's strategic practice to remove specific employees from its workforce.

104. IBM targets older employees for termination through impossible-to-achieve PIPs while protecting younger employees with similar or worse performance.

105. IBM's discriminatory practices are designed to replace older, higher-paid employees with younger, lower-paid workers.

106. Indeed, as Plaintiff understands, IBM only permitted hiring tickets for lower-banded employees as the Power System team's management prepared to replace the terminated workers.

107. Using PIPs as a tool to terminate older employees, IBM changes territories and quotas to disproportionately impact more experienced sellers that have developed long-term client relationships.

108. Palmer's treatment is consistent with IBM's broader pattern of age discrimination that has been documented in other cases and investigations.

14

Case 1:26-cv-00004    Document 1    Filed 01/02/26    Page 14 of 20

109. Despite IBM's discrimination, Palmer made a good faith effort to comply with the PIP terms.

110. Palmer worked diligently on his territory, maintaining client relationships and pursuing sales opportunities.

111. Palmer upheld his professional responsibilities and continued to be regarded as a knowledgeable expert in Power Systems by clients and colleagues.

**Palmer Exhausted his Administrative Remedies**

112. Palmer exhausted his administrative remedies at the Equal Opportunity Commission and is entitled to pursue his claims in this Court.

113. Palmer filed his charge of discrimination with the EEOC on September 2, 2025.

114. On December 23, 2025, the EEOC issued Palmer's Notice of Right to Sue, which his counsel received the same day.

115. Palmer filed this Complaint within 90 days of receipt of that notice.

**FIRST CLAIM FOR RELIEF**
**(violation of the Age Discrimination in Employment Act ("ADEA") of 1967, 29 U.S.C. § 621, *et seq.*)**

116. Plaintiff re-alleges and incorporates the prior paragraphs of this Complaint as if fully set forth herein.

117. At the time of the discriminatory conduct described herein, Palmer was 61 years old.

118. IBM, and in particular Palmer's supervisors Kennedy, Lee, and Smith, were aware of Palmer's age and his approaching retirement eligibility date of April

9, 2026.

119. Palmer performed his job successfully during his time working for IBM and received numerous high-performance reviews, including "Successful" ratings in both Business Outcomes and Skills.

120. Palmer's exceptional performance was formally recognized when he achieved 97.67% of his fiscal year target in 2023, earning $7.83 million against a $7.86 million target.

121. Palmer received an equity award in August 2024 consisting of approximately 145 shares specifically for his outstanding performance, with personal congratulations from Vice President Smith.

122. Palmer was one of the first National Power technical sellers to successfully sell a PowerVS deal in both 2023 and 2024, demonstrating his technical expertise and value to IBM.

123. In addition to Palmer's objective, measurable success, he also received high marks for his dedication to continuing education and unsolicited compliments to his management from colleagues.

124. Despite his strong performance record and recent recognition for outstanding performance, IBM intentionally targeted Palmer with an unachievable PIP on May 9, 2025, several weeks after his return from approved bereavement leave.

125. IBM's decision to place Palmer on a PIP was motivated by IBM's desire to replace Palmer with a younger employee due to his age.

126. The PIP imposed on Palmer—with a June 30 deadline—contained requirements that were impossible to achieve given the sales cycle timing and the major IBM product announcement scheduled for July 8, 2025, which caused clients to delay purchasing decisions.

127. The mere implementation of the PIP contradicted Palmer's management's prior assurances that performance plans would not be forthcoming despite the Power Systems team's struggles in 2024 (resulting from IBM's own mistakes with internal territory changes beyond the sales representatives' control).

128. Moreover, IBM treated employees on the Power Systems team differently despite the struggles that everyone faced the year before.

129. Palmer's sales teammate, a black woman with the exact same territory, quota, and performance, was not placed on a PIP.

130. Mark Roper, a younger white male in his early 30s with low performance was given an exception from being placed on a PIP because he had a big year two years ago—just like Palmer was recognized for in 2023.

131. More generally, younger employees from Lee's team were completely spared from PIPs.

132. IBM also replaced Palmer with younger employees by limiting the hiring tickets that management was given to only lower-banded, less experienced employees.

133. As a direct result of IBM's ADEA violations, Palmer has suffered a loss in earnings capacity due to his termination and the damage to his employment record

17

caused by the pretextual PIP.

134. Palmer is entitled to recover damages including back pay, front pay, liquidated damages, and reasonable attorneys' fees and costs pursuant to the ADEA.

**SECOND CLAIM FOR RELIEF**
**(wrongful termination in violation of North Carolina public policy)**

135. Plaintiff re-alleges and incorporates the prior paragraphs of this Complaint as if fully set forth herein.

136. North Carolina law holds that an employer has no right to terminate an at-will employee for an unlawful reason or a purpose that contravenes public policy.

137. Public policy is the principle of law which holds that no citizen can lawfully do that which has a tendency to be injurious to the public or against the public good.

138. It is the public policy of the State of North Carolina, as expressed in N.C.G.S. § 143-422.2, "to protect and safeguard the right and opportunity of all persons to seek, obtain and hold employment without discrimination or abridgement on account of race, religion, color, national origin, age, sex or handicap by employers which regularly employ 15 or more employees."

139. Furthermore, it is the public policy of the State of North Carolina, expressed in Section 1 of the North Carolina Constitution, that "all persons are created equal; that they are endowed by their Creator with certain inalienable rights; that among these are life, liberty, *the enjoyment of the fruits of their own labor*, and the pursuit of happiness."

18

140. Palmer was 61 years old when IBM put him on a PIP and terminated him.

141. IBM employs more than 15 people.

142. IBM violated the public policy described above when it targeted Palmer with a PIP that was impossible to satisfy and ultimately terminated him because of his age—while protecting younger employees with worse, or at best similar, performance records.

143. IBM had no right to subject Palmer to adverse employment actions, including the discriminatory PIP designed to effectuate his termination, because it did so for an unlawful reason or purpose that contravened public policy.

144. Such discriminatory treatment has caused Palmer to suffer emotional distress, damage to his reputation, lost wages, and other damages as described throughout this Complaint.

145. Accordingly, Palmer is entitled to compensatory damages, including costs and interest, under North Carolina law.

## PRAYER FOR RELIEF

WHEREFORE, Palmer prays the Court for a judgment against IBM as follows:

1. That Palmer have and recover from IBM for violations of the ADEA;

2. That Palmer have and recover from IBM for his wrongful termination in violation of public policy in an amount exceeding $75,000, plus interest, costs, and attorneys' fees;

3. That Palmer have and recover from IBM actual and compensatory damages;

4. That Palmer be awarded reasonable attorneys' fees and costs;

5. That Palmer be awarded punitive damages for IBM's willful, wanton, and reckless conduct;

6. That all costs of this action be taxed against IBM;

7. That Palmer be awarded pre- and post-judgment interest on all monetary awards; and

10. That the Court award Palmer such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

This the 2nd day of January, 2026.

Respectfully submitted,

*/s/Matthew E. Lee*
Matthew E. Lee
N.C. Bar No. 35405
Jeremy R. Williams
N.C. Bar No. 48162
Eric G. Steber
N.C. Bar No. 54999
**LEE SEGUI, PLLC**
900 W Morgan St
Raleigh, NC 27603
Phone: (919) 600-5000
Fax: (919) 600-5035
mlee@leesegui.com
jwilliams@leesegui.com
esteber@leesegui.com